Rodriguez v. National City Bank Good morning. Good afternoon, I guess. Good afternoon, Your Honors. May it please the Court, my name is Peter Muhic and I represent the plaintiff petitioners in this case. We kindly reserve five minutes for rebuttal. Surely. Your Honors, the issue here today is the proper scope of inquiry in the application of relevant legal standards when considering certification of a settlement class in the context of a motion for final approval. Contrary to the well-established policy in this circuit of encouraging voluntary settlements, particularly in the class action context, the district court in this case abused its discretion by deviating from the prescribed role of the district court and evaluating a class settlement by misapplying Walmart to a settlement context involving disparate impact lending discrimination and holding that plaintiffs failed to establish the element of commonality necessary for the certification of the settlement class. What is the significant issue in this matter? What is the uniform policy here and what is the common answer that would be gathered if we were to say commonality were found here? How do you establish it? Your Honor, the uniform policy, and I'll address the uniform policy as well as the common question. And first if I can mention the common question is, was each class member subjected to a company-wide policy that allowed the salespeople, the loan officers, to subjectively increase the price paid by black and Hispanic borrowers irrespective of the objective credit-related criteria? How is that different from the question that was found not to be possible in the cases where people said, and a very forceful dissent by Justice Ginsburg said, hey, there's a common question here in that people are being subjected to a discretionary system of review which is leading to disparate impact. And the majority said there's just too many subjective factors that can potentially go on if we can't see a common question. What is the distinguishing feature between that question in Dukes and the question, the subjective question you're complaining about? Your Honor, there's two significant issues that lead to the distinction. First is the context of the litigation. In our case, significantly, this was a settlement for purposes of, certification of a class for purposes of settlement. It was not a contested motion. But you still have to have commonality even with a settlement. Yes, Your Honor. The factors for Rule 23 apply with a settlement class as with a class in litigation. But the focus of the court is different. With respect to Rule 23. Why is it different? What law says that? Your Honor, this court has stated multiple times, most recently in Earhart. The court noted a couple of guiding principles. First was the restricted, tightly focused role that Rule 23 prescribes for district court requiring them to act as fiduciaries for the absent class members. With respect to a settlement, the focus, as this court has made clear, is upon the protection of the absent class members. It's not issues with respect to the manageability for trial. Issues that could occur at the time of trial. It's whether due process is protecting the absent class members. Whether the settlement is fair, reasonable, and adequate. The district court wasn't torn up about manageability issues. The district court was concerned about commonality. Something the district court is obligated to look at. So what is it about the settlement context that makes you say that the district court was off base in looking at this case and saying, this looks kind of wobbling and quacking like Duke's, I think. So I'm saying it's like Duke's. How is that going outside the judicial role for the district court? Your Honor, by comparing this case to Duke's, and the panel had asked how this case differs from Duke's. Duke's, in addition to being in a litigation context, significantly involved a very, very expansive class of employees across the United States. So approximately one and a half million individuals. Of significance in Duke's, the issues, the reason that there was no commonality, no glue that held that class together, is because there were literally millions and millions of different decisions that were made. Duke's had more problems than this class. But still, the court was quite explicit on the commonality requirements here. Even to the point of saying that you had to look at it, look at the issues supervisor by supervisor. Your Honor, and the reason that that was necessary in Duke's is because it was purely subjective criteria that were being used for the decisions. Well, in this case, everybody qualified for the loans. All the applicants and the comparators qualified for the loans. So there was discretionary decisions that were made by either the supervisors or by the lending or the loan officers. Why isn't each one of those an individual decision? Your Honor, in this case, it was one decision and one transaction for the class members. This was a product being sold. It was a loaned product. There was one transaction. After all the class members were objectively qualified on that same objective criteria to be qualified at a par rate, there was then one decision that was made, increase the price or decrease the price. Why do you say it was one decision? There was, well, let me ask it this way. You don't contend that the objective factors, that is, those things that brought a person to the loan qualification point created a disagreement, right? In fact, you couldn't based on the admission you just made. Everybody qualified, right? Correct. So your entire case rests on the fact that there was a subjective decision making that went on after that, right? In conjunction with the fact that statistic, the analysis shows that when controlling for all of the objective criteria, the only variable, the only factor that can explain the difference for minorities paying a higher price was race. All other factors were controlled. And how did you come to that particular conclusion? Through the regression analysis? Yes, Your Honor. In this case, we had an expert. And notably, we went to parties before reaching the settlement, after two years of litigation, after substantial depositions, document review. There was a two-day, full-day mediation where each side had their experts participate. There was a full opportunity to debate all of the issues. And where was that done? In Philadelphia, Your Honor. But the district court made no findings on the regression analysis. It was not presented to him. Is that correct? Correct. The regression analysis itself was not submitted. The parties represented. Is that significant here? That is, it might be one thing if the district court had looked at the regression analysis and came to the same conclusion that you've just put forward. But here, there was no finding made by the district court that the regression analysis could deal with all of the other variables and you'd end up with just one likely finding. And that is that this was race-based decision-making. Your Honor, in the context of our case in the settlement, the findings of our expert was unchallenged for purposes of the settlement. This was an unopposed motion. In contrast to Duke's, for a contested motion of litigation, where the defense is putting forth all of their counter evidence and their expert evidence, in this case the parties, as this Third Circuit has said, they should be encouraged to settle actions. It's going to alleviate expense to the parties. It's going to alleviate the burden upon the courts. And class action settlements should be encouraged. All of that is good. I don't think you're going to get any disagreement on that. But the point is, what does Duke's require now that did not require before? The Seventh Circuit has grappled with this issue in two cases that you've cited, the McReynolds case and the most recent case, the Bolden v. Walsh Construction Company. And they seem to have cases that might be irreconcilable, or maybe they're not. Obviously, there's a pretty fine line between. Duke's did not say that this type of case, particularly a lending discrimination case, would not be certifiable. In fact, just recently, as plaintiffs submitted,  entered final approval for a similar type of settlement. This case is very distinct from Duke's. It's a much more narrow scope. It's a limited class. There is not the unlimited discretion. In Duke's, it was issues with respect to hiring, firing, promotions, pay raises, demotions, whether someone would be transferred to another particular position. Here, again, it was one transaction, one sale, and whether or not it would be increased. But that doesn't mean there's one decision that goes into it, right? I mean, the person sitting across the table from you. You know, perhaps a decision is made on a matter that's not particularly a good one, but I've got indigestions. I don't like what I had for breakfast. I'm not going to write this loan now. I'm going to, or perhaps it has nothing to do with race, but it has to do with some sort of a sense that, well, I just don't like the way that person is looking now. I don't think it's a question of doing it. When you say that there was one decision and it was controlled for all other factors, that seems to make it sound as if the enormous complexity of a subjective decision can be reduced to numbers and that you can safely say nothing happened here except a single decision and we know it was race-based because we have an expert who says so. Your Honor, if this matter were to go to trial, defendants would be expected to put forth evidence to rebut the merits of plaintiff's claims. If the Court were not to approve a settlement in this case, the policy being set forth is that parties cannot settle this type of action prior to extensive, expensive expert discovery, including depositions, full reports. There could never be an early resolution of this type of case if the District Court would require there to be complete expert production and any possible issue that the District Court could think of. You've already done it in this case. You have apparently a good expert. Your Honor, we had a consultant. And a consultant. I take it that you're relying on this to show that in this matter that we do end up with a common issue or an issue that's capable of class-wide resolution. If that is the case, why shouldn't it have been submitted to the District Court and let the Court make a finding if the Court said, Yes, I agree with you that the regression analysis does solve this problem. Aren't we in a different circumstance than we are now? Your Honor, the Courts have not required there to be expert reports for purposes of a settlement class. No, I know that. But Dukes has said we've got to find... Dukes has changed, to some degree, at least the landscape on certification. It's a question of what has to be done to comply with it. Your Honor, in a contested class, Dukes, the concern is protection of the defendant where it's a contested motion. The Courts recognize certification of a class brings with it potential tremendous liability and exposure for damages to the defendants. In this case, any potential exposure and liability has been negotiated. Correct. It is not going to be determined by the trier of fact. Therefore, the considerations by the Court in looking at the class do not need to include considerations of is it fair to the defendant. The defendant, as this Court has said in Earhart, we make clear, the fiduciary protection does not extend to defendants in a class action who are in a position to protect their own interests during negotiation. Let me ask you an Earhart question. I know you entered into the proposed settlement. Right. Final approval was not given by the District Court to the proposed settlement. But is there any distinction between the status of the proposed settlement and the proposed settlement in Earhart? Your Honor, in Earhart, it was within a couple of days after preliminary approval where there was a change in the law. Yeah, I know the change in the law facet. But was there a signed agreement? I believe I was on the panel in Earhart, did not write the opinion. The NIAGAR did. And I believe in Earhart there was a signed settlement agreement. Correct. Was there a signed proposed settlement agreement here? Your Honor, we already had preliminary approval. And you had preliminary approval? Yes, Your Honor. This was at the final approval stage. I know you were. Okay. But was there a signed agreement here? Yes, Your Honor. Okay. And the Court had already agreed preliminarily. So procedurally, there's no distinction between this and Earhart. In fact, you went further than Earhart did. Correct, Your Honor. And, in fact, in Earhart, where there was no cause of action for the plaintiffs at that moment in time after the law changed, here we do have a cause of action. The issue is the interpretation of Walmart with respect to a settlement class as opposed to a very broad, diverse group in an employment-related context, which … If we denied your – which is hanging out here. I'm sure maybe Judge Sirico will get to this. If we denied your petition for permission to appeal, which has not been acted on by this Court, could you not potentially raise the Earhart question in a subsequent appeal from a final order? Your Honor, I believe plaintiffs would have an argument that, to the extent that Walmart would be considered a change in the law, then any change in the law should not apply to our agreement that was, in effect, and signed prior to Walmart coming into existence. If that were the position of the Court, a change in law, we believe that we would certainly recover because our agreement – and notably, the parties here … I know what you're saying, but I'm not sure you answered my question. I said if we did not grant the petition for permission to appeal under Rule 23-F and there was a final order entered by the District Court, could you then file an appeal from that final order, claiming that your case was covered by Earhart v. Verizon? Your Honor, I believe we would still need to move interlocutory for permission to appeal. I believe there would be – there would still be claims of these individuals … There would still be claims of the individuals. Okay. So in your petition, the Earhart question is properly before us. Yes, Your Honor. To the extent that the Court would consider there to have been a change in the law. If I just add, notably, in this case, in the context of the settlement, the parties specifically were aware of the risk of maintaining a class because of Walmart pending. To not certify this class is in conflict with the Gersh factors, where factor number six, when considering the fairness of the settlement, looks at the ability to maintain a class. If the Court is to consider fairness in the context of the less likely that you could keep it certified, the more fair it is and the better able you are to then approve it, there would be an inherent conflict there. All right. Now Judge Rubino did think that there was a change in the law because of the Walmart decision. How do you read Walmart as impacting on the traditional disparate impact claim? Do you think it's not changed it at all? We know that the Court said that it cited Watson and other disparate impact cases and seemed to say that it still is a viable cause of action, obviously, statutorily provided. But has it undermined the disparate impact kind of action, in your view, and if not, why not? Your Honor, in the lending discrimination context, we do not believe it does. Walmart, we believe, certainly applies in the context of, one, a litigated matter as opposed to a settlement. Again, we are not, our motion was not opposed. This was joined in by the defendant. So the considerations by the District Court should have been fairness in any risk of collusion or conflicts and considerations for the absent class members. With respect to Walmart and its effect on disparate impact, again, for an employment litigation case, it certainly would have an impact. The parties need to look. Is there a common question? Is there a glue? Here in our case, we do have a common question. We do have a glue. Again, it's much more narrow than Walmart. So we don't think Walmart would prohibit it. So we think the facts in our case are clearly distinct from Walmart. And again, the context of settlement versus litigation, where in litigation, defendants, the concern of the court is going to trial. They have to consider some of the merits, and the merits blend in with the class issues. That's what the court in Walmart looked at. Is it fair to bring a class of 1.5 million people to trial against this defendant, given the variety of all the different claims? It's very distinct from our case. Well, when you say it's very distinct, it's true it's not 1.5 million, but it's like 150,000 individual loans, perhaps multiple decisions associated with each loan. So this is not a minor undertaking to try to consider whether you can find, as you've termed it in this case, the glue that holds a class of that together, right? It's not precisely Walmart, but it's a sizable class with lots and lots and lots of people in lots of places all across the country and individual loan decisions for all of those people, right? Your Honor, we agree that it is still sizable class. There's individuals, there is one transaction for each individual. Again, if this matter were to go to trial, defendant would be sure to raise issues as to what was the real motivation, what was at play with respect to the increased price paid by all of the minorities. Here, where there has been a settlement, that doesn't have to be a consideration. The Court does not need to look into the issues of the particular merits. As this Court said in De Beers, commonalities informed by defendant's conduct to all class members. The Court further said a merits inquiry is particularly unwarranted, since the district court may not envision the form for trial. In Walmart, the merits inquiry was necessary, because again, if the Court was determining whether Walmart was going to face very substantial exposure from certifying that class. Here, where defendants have negotiated any exposure under liability with sophisticated counsel, after an extensive period of litigation and mediation, they've agreed. Both parties looked at the risks, looked at the risks of continuing, looked at all of the factors that go into a settlement, and determined to enter into a good-faith, arms-length negotiation, where they bargained away the right to go to trial. The only consideration from the Court should be, is this fair for the absent class members? Notably, the district court did find the issue in in-rate pet foods and related cases has been, is there adequacy for the class representative to represent these parties? Our district court specifically found that the plaintiffs were adequate representatives, that they would represent the interests of all the class members here. It was simply the issue of commonality where the Court erred by relying on Walmart, where Walmart was in a litigation-contested posture, unlike ours. Anything else you want to tell us? Your Honor, I'll be back on rebuttal. All right. Thank you. Thank you very much. Mr. Patinsky. May it please the Court, David Patinsky for the National City Defendants and PNC, the successor in interest. First of all, I want to read to Your Honor a simple sentence from the petition for permission to appeal filed by Mr. Rodriguez. This was in the petition, the 23-F petition for permission to appeal, JA-7 in the record. The discretion at issue here was always exercised by way of a single choice, a single choice during a single loan transaction in the form of a subjective increase or decrease to otherwise objectively determined loan rates. Now, this is the same situation that you had in Walmart. They alleged a national class. There were 2,000 offices that National City had. They gave out 2 million loans over eight years. If you would, go right to the issue of this is a settlement. Walmart wasn't. We're different. What's wrong with the argument that we've just heard from plaintiffs that there's just nothing like Walmart going on here when a sophisticated party like your client, recognizing that there's risk, chooses to come in and settle a matter, particularly after Earhart, which says post-settlement changes in the law don't obviate the settlement. Well, first of all, Your Honor, what happened here is that there was a settlement.  AMCM, which is the Supreme Court of the United States decision, makes it very clear that even when there is a settlement, you still have to determine that the requirements of Rule 23A have been satisfied to certify a class. And they're not arguing with that. What they're saying is that in the settlement class context, even after 23A, and given this court's decision in Sullivan, the focus has to be more precisely directed at absent class members. And here, that wasn't the district court's approach. The district court was sort of on a frolicking detour looking out for defendants who should have been doing that. Well, I don't think that's what it was looking out for defendants. I know, I know, but I'm responding to what they're saying. It's got to be just on absent class members. That's not the law. That's not the law. The law is you have to, for any class, for any settlement, you have to demonstrate that the requirements, all of the requirements of Rule 23A have been met and satisfied. That's what AMCM says. That's many of the decisions of this court. In fact, in AMCM, they said there's a heightened responsibility to determine that all of the requirements of Rule 23A have been met. And in Sullivan, if I may, because you can't certify a settlement class without having the requirements satisfied. Period. Because of concern for absent class members, right? Isn't that what AMCM is all about? Well, I think that's one of the concerns, yes, but I think the rules are the rules, and Rule 23A has a requirement of commonality. And whatever the motivation for it, the court has to be satisfied. In fact, in the community bank case, the court said even where there's, as we have here, a stipulation to a class, the court has an independent duty, an independent duty to satisfy itself that all the requirements of 23A have been met. And here's what you said in Sullivan. Here's what the majority said in Sullivan. In Dukes, excuse me, I know you were in the dissent, Ron. I know that. I remember that. But here's what the majority said. In Dukes, the court held that commonality and predominance are defeated when it cannot be said that there was a common course of conduct in which the defendant engaged with respect to each individual. Now, what you had in Dukes, according to the majority, what you had in Dukes was that De Beers used its market dominance to inflate the prices for rough diamonds. And that was what the majority said applied to all of the members of the class. And it clearly did. Now, here's what you have. Here there is no common mode of exercising discretion by all of these loan officers. Over 2,000 officers, thousands of loan officers all over the country, they're making this individual decision, which I just read to you, about whether they should increase or decrease the rates. And there's no common mode for them to exercise this discretion. Mr. Patinsky, notwithstanding that, and notwithstanding your knowledge when you entered into the proposed settlement that there was a dispute pending in Dukes v. Walmart, your client agreed to settle. That's correct. We did. Okay. And, in fact, in front of the district court, you stuck to that. That's because we didn't violate Earhart. We stuck to the agreement we made. Okay. You stuck to that. Yes. Okay. Now, in the petition for permission to appeal, and as I asked counsel and I went to the petition here as he was speaking, they did cover Earhart in the petition. Yes, they did. So why shouldn't Earhart apply? You had a deal. Earhart, the fact that the law changed, that was Verizon's way to get out of the deal. Okay? In Earhart, we said you had a deal, you were bond by the deal. All right, here, the law that changed was the Supreme Court said on commonality, we need to look at this in a broader sense. We need to look at the answers, not just the questions. We look at the whole scope of it. The law changed. But here, you still had a deal. Yes, but, Your Honor, the question, the difference is that under Rule 23A, the court has an obligation to determine if commonality has been satisfied. 23A was there in Earhart. Yes, but that wasn't the issue in Earhart. The issue in Earhart was whether Verizon had breached the settlement agreement. No, you made the issue here in this appeal, 23A. Yes. And the reason, can I just say why? Because under our agreement, our settlement agreement, once Judge Rubino ruled, which he did sua sponte, once he ruled that he was not going to certify the settlement class, under our settlement agreement, we were free at that point to oppose the petition. I don't, I'm not faulting you for taking that posture. What I'm saying is what we have here is the Walmart versus Dukes decision, and I think all of us focused a lot of our efforts on the comparability between the two cases. But what we also have is an Earhart versus Verizon similarity. And it is properly before this court, if we accept the petition, it is properly before this court. I'm having trouble finding the distinction between the two cases. Well, the distinction, Your Honor, is that the judge, as this court said in Community Bank, the judge, and as the Supreme Court said in AMCAP, when you're certifying a settlement class, you have the obligation to determine whether or not the class satisfies the requirements. Now, that's as of the time they make the decision. You don't go look at it at some prior time. You have to look at it when he makes the decision. All right. I hear your answer. But the judge in Earhart versus Verizon said on a motion for judgment on the pleadings that they were going to grant judgment to Verizon on the motion for judgment on the pleadings because there was no longer a cause of action. Correct. Different in commonality. Yes. But post hoc. Correct. I agree with Your Honor about the facts in Earhart. There's no question the facts in Earhart were that Verizon, after the change in the law, made a motion for judgment on the pleadings to try to get out of their settlement. There's been no effort to do that here. But I still say, Your Honor. You're just doing it under Rule 23A. Well, I think the court would have to find, first of all, that there's been a, quote, change in the law by virtue of Walmart. And I think the Walmart court would say there has been no change in the law under Walmart. They would say we certainly gave an indication of where we were going in the Falcon case. And now what we're doing is we're telling everybody else. Couldn't all we would have to say is that at the posture where this case was before Judge Rubino, that he did not need to evaluate the impact of the Walmart decision on this case because you had an agreement. Well, respectfully, I would disagree with that. I would say respectfully that he did the right thing. When he asked the parties, he issued an order. He asked the parties what was the impact of Walmart. We, because we were bound by the agreement at that time, said we refer to the plaintiffs. Did he ask you what the impact of Earhart was? No, but they told him. All right. The plaintiffs told him. I suspect they did. Right. And he came out sui sponte with his decision because he was deciding whether this class satisfied Rule 23A. And he found, and I think he's right, he found that this class was just like the Walmart. If I may just say a couple of words, a couple more words about this. There have been three district court decisions since Walmart for the same identical class that we have here. Different lenders, but for minority borrowers suing under ACOA and the FHA for discretionary pricing, just as we have here, and based on a regression analysis, which I'll come to in a moment. And in each of those three cases, the courts have said there's no basis for commonality. And so what Judge Rubino did is not an outlier. It's, in fact, the common response here. In addition, and in all those cases, by the way, they said there was no common mode of showing how discretion was exercised. And, of course, that's right when you think about it. You're thinking about thousands of loan offices and third-party brokers making loans, not just to 150,000, Your Honor, 150,000 minority borrowers, but the people to whom you're supposed to compare them to determine if there's discrimination. They made two million loans over this period of time. Sure, and they say we have accounted for all variables in our regression analyses, and the only factor that can explain the disparities is race. And had we had an opportunity to, we could have made that case, but we were cut off at the pass, and that's just wrong. Yes. So what's wrong with that assertion that they didn't get a chance to do what they would have done, but for the district court stepping up here when they say it should not have? Well, there are two responses. I'm going to give one that this Court itself has given, one by Judge Sirica in the Gates case, because in the Gates case, and this was a case where you had an exposure to toxic tort by a community, and the expert came in with an analysis that purported to show that the average, the average exposure of every member in this community was sufficient to justify the claim. And this Court, and Judge Sirica was the author of it, he said in Gates, where you affirm the refusal of Judge Pratt to certify a class, Judge Sirica said the evidence here is not common, in quotes, because it is not shared by all, possibly even most individuals in the class. Averages or community-wide estimations would not be probative of any individual's claim because any one class member may have an exposure level well above or below the average. And that's what happens with regression analyses. They give you an average disparity, and it's not disputed, an average disparity between, in this case, the minority borrowers and the Caucasian borrowers. And it doesn't tell you whether any of the members of this class are above or below that average. It doesn't tell you who is above it, who is below it. It doesn't even tell you how many of these members were given better deals than Caucasians. And in fact, the only way you could tell in this case is you'd have to take an individual member, let's say a minority borrower, and take a broker or a loan officer who gave that minority borrower a loan and find a Caucasian borrower who had the same basic financial circumstances at the same time and was given another loan and compare the two. An average doesn't tell you anything about the members of the class. And that's what Judge Sirica said in the Gates case. So is it true what they're saying, that Walmart froze out 40 years of civil rights law? Well, I'll say this. Well, I'll say this about Walmart and regression analysis, because that's what you're asking. Walmart says that the regression analysis there, which was a national regression analysis and does the same thing, produces an average disparity between, in this case, the women and the men, that that did not suffice because it didn't take into account the local variations of the various supervisors and employees at Walmart all across the country who were making individual decisions. And they did. And many more. I would say they did throw it out for national regression analysis. They said you'd have to have it on a local level. From under your view, there doesn't seem to be much of a future for the disparate impact claim. Am I correct about that? Well, Your Honor, I've thought about that, I must say. I've given that a lot of thought. And I think if you follow the five-justice majority in Walmart, that there isn't much future for disparate impact claims. I think that's, they're saying you cannot do it in a big class. Again, now remember, we're talking about discretion. And they said discretion is the antithesis of commonality. That's what they said in Walmart, absolutely antithesis of commonality. They cited Watson, they cited the Teamsters, they said we're not ruling it out. There may be cases where it could be appropriate. But I'm trying to figure out where it is appropriate, under your view. Well, in my view, it's not appropriate where, again, as in Walmart, that was gender neutral, this is race neutral. There's no claim here that we had any intentional racial discrimination by anybody. And in the Fairness Hearing, they said it was race neutral. But if, in fact, they can identify all of the other variables, factor them out, isn't it possible that you end up with only one variable, and that's race? Well, Your Honor, first of all, even if that, we don't agree with that, we disputed it, but we never had a hearing, and that's really true. I understand. But even if you assume that their regression analysis was a perfect regression analysis that took into consideration all of the independent variables that they should have, and did it in just the way they should have, it still only tells you, in a discretion-based case, where the single, I just read the language about single choice in each determination, in a discretion-based case, it doesn't tell you who was victimized in that class. It's an average disparity between whether it's women and men, whether it's minorities and non-minorities, it just tells you an average. And so it doesn't tell you, where in our case 150,000 members of the class, it doesn't tell you who was above or below that average, who was actually disadvantaged. Some people were advantaged. So it doesn't tell you anything. It just gives you an average. And that's not, a given commonality, that's not sufficient. And that's what Your Honor said in Gates. Well, you know, these cases also have to be looked at, because the employment discrimination cases may be different from toxic tort cases, unfair lending practices may be different from others. So it seems that all of these have a little bit different aspect to them, depending on context. Again, though, the reason I read what I read from Gates is because, Your Honor, I thought it was saying something more general about averages. Well, I'm testing you here. Yes. But if I may just have a minute to address McReynolds, because Your Honor raised McReynolds. Yes. And obviously I have great respect for Judge Posner, who decided McReynolds. But here's what he said in McReynolds. He said that the two policies, the teaming policy and the account distribution policies, and this is right in his opinion, were policies of Merrill Lynch. They were policies of Merrill Lynch, and they were not subject to being varied by the local brokers. And it was a B-2 case, Your Honor. It was a B-2 case. No, but it was a policy to give discretion. No, here's what he said. But in a disparate impact case, the presence or absence of discriminatory intent is irrelevant, and permitting brokers to form their own teams and prescribing criteria for account distributions that favor the already successful are practices of Merrill Lynch, rather than practices that local managers can choose or not at their whim. You can frame almost anything. You can make the question at any level of abstraction and peg it at any level in the organization that you want. I think the Supreme Court's comment in Wal-Mart that you can come up with questions by the droves as apropos there. So, I mean, couldn't somebody just as well say here, and the plaintiffs do say, you had a policy here of giving discretion to people, and in handing that discretion down to people, that policy of the organization generally opened the door to racial discrimination. That's a policy of the National City Bank that's common to everybody. How is that different from what judges do? Well, because here they don't make that claim. Here their claim is that this was all done on a discretionary basis without any leadership from the top. He said that the teaming policies that they actually used there were policies that Merrill Lynch wanted to do to create the very discrimination which ended up being created. Now, McReynolds emphatically was not a case in which they said, we're going to give you this discretion because we want to create discrimination. They didn't want to create discrimination. It was the effect of what they did because they had a policy that gave the opportunity for teaming at the local level, and that had certain consequences that the court was prepared to say to Judge Posner was potentially a basis for liability because of incremental causal effect from that policy. So, they say in this court, in this case, the plaintiffs, we have a policy from the National City Bank. That's what I think the policy is. We give this discretion to everybody across the country to decide whether they're going to bump or reduce somebody's loan rate. That's a national policy. That national policy opens the door to discrimination just the way the policy in McReynolds opened the door to discrimination in the Seventh Circuit case. How do you distinguish it? Well, I guess how I distinguish it is twofold. One, I say this is Walmart. If that is what Judge Posner is really saying in McReynolds, then he is saying something that is in conflict with Walmart because that's clearly not what Walmart says. That's my first answer. My second answer is to point out that when it came to B-3, the B-3 consideration, which was an issue that was deferred in McReynolds, Judge Posner said he didn't know whether there were common issues or there were no common issues or common issues for the B-3 purpose because they were deferring that issue. He only found what he found for the purpose of injunctive relief. And I think that's a significant point that he didn't decide that if you had a B-3 action where you have to show that the common issues predominate over the individual issues, he didn't know whether there were common issues or not because they deferred that issue. He specifically said that at the end of his opinion. So I think, you know, when you're dealing with what we're dealing with here, which is a B-3 class, you still are bound by Walmart. And the question is whether there is any common mode for looking at the discretion that was exercised in this single-choice decision made by thousands of loan officers and third-party brokers in over 2,000 offices in the entire country when they were making 2 million loans and 150,000 of them went to minority borrowers. Thank you. Good. Any questions? Mr. Potensky, thank you very much. Mr. Mouhit. Thank you, Your Honors. Your Honors, the Court asked the question, why should the analysis be different in the context of settlement and what authority is there? Your Honor, in AMCM, the Court said specifically, the Supreme Court, settlement is relevant to class certification. With respect to the heightened attention, of course there is a need to satisfy the elements of Rule 23. The Supreme Court specifically said the heightened attention should be to the interests of the absent class members, not to the defendant. Again, that is the distinction in a class settlement, because the absent class members are the parties who are not subject, who are not part of the negotiations and the mediation. Commonality is commonality, right? I mean, whether the beneficiary of the commonality decision is a defendant or somebody else, the population generally, because the law has indicated, absent class members who won't have their class diluted by having people in it who shouldn't be in it. I mean, the law is still the law. You've got to satisfy 23A. Nowhere in AMCM does it say, don't worry about 23A if you think the absent class members are okay. Does it? Your Honor, what AMCM says is, protect the absent class members from unwarranted overbroad class definitions. In AMCM, specifically, the reason that this rule of law came about was where it was such a broad, diverse class that was trying to be certified with different exposures, people with significant personal injuries, people who had death, people who had just exposure and no exposure. In our case, first, this is the quintessential consumer class action, where there are relatively small damages for each class member. They could never afford to bring litigation on an individual basis to recover the damages that they suffered here. But for the settlement, they will have no – the court is – the district court is holding they can't even settle this case. You get the cart before the horse, though. I mean, your assertion there presumes that there's a right to bring this as a piece of aggregate litigation, as a class action. To get to that right, you have to show the 23A factors. So saying there's a good at the end of the line doesn't get you past the first step, does it? No, Your Honor, and again, we do not dispute that we need to satisfy the elements of Rule 23. In De Beers, the court gave good guidance with respect to commonality, where the court said, look to see whether it's sufficiently cohesive. Again, in the settlement context, De Beers was an incredibly expansive group, where it essentially covered anyone who had – one of the groups, anybody who had purchased a diamond. Here, ours is incredibly much more narrow and focused than that case. But you can at least say, in De Beers, you can say a lot about De Beers. One thing you can say is there was at least an assertion that De Beers centrally made a decision about price control. Here, you have thousands of decision-makers making individual decisions, and the burden on you is to say there's some way that you can tease out of that a common mode of decision-making that could be called common to the entire class of people affected. So isn't that just at the absolutely polar opposite end as De Beers, where you had one decision-maker making a price-fixing decision? Your Honor, actually, it's quite similar in an important respect. Here, we had the top decision-maker at National City who decided there would be subjective criteria allowed. Now, notably, regulations have since prohibited this subjective evaluation, where the decisions need to be based only on the objective par rate, that criteria. It was the single decision from this company to allow discretion to be part of the equation. There was no need for it, no business necessity. Just the case in Wal-Mart, too, right? Exactly the case in Wal-Mart that the Wal-Mart central folks said, you managers, you make the decisions. And the court said that is not enough. Your Honor, in Wal-Mart, there was no way for objective criteria to apply to all the class members. This would be the equivalent if there was an objective standard for, if you're just to limit Wal-Mart to a promotion. If there was objective criteria where every class member had to meet certain objective criteria, if they were all qualified for it, and then there was an issue, would they be promoted or not? That's what we have here. We have the objective criteria. Everyone is qualified on the same basis. They have their rate. And then the discretion comes into play. Wal-Mart, it's naturally and it's subjective because all of the employment decisions are subjective, whether you like someone, whether they should be promoted. Do you think they're a good person? Do you think they're a good worker? That's not the objective criteria. Your argument is that those same sorts of things can't happen in the loan context, or at least if they can, you, by your regression analysis, wash them all out of the system. Is that right? That has to be the premise of your argument. Your Honor, ultimately at trial, there would be a battle of the experts. Defendants would have an expert who would challenge our statistician, our sociologist, who would testify. In these types of cases, there's expert testimony from sociologists who would testify as to the inherent discrimination, whether it's subconsciously or otherwise, that plays a role when these types of loan officers have discretion. It's known. It's something that an expert can testify to. If there were a battle of experts at trial, that would be an issue, but not in settlement. But all we're concerned about here is is it capable of common proof. We don't have to go to the merits in this matter. Correct, Your Honor. And we believe that the court can look at the common issue. The defendant decided to inject subjective criteria into the loan-making process where there was no need for it, and it has since forth been prohibited. To not allow the parties to go forward with this settlement, again, would prohibit settlements absent expensive, time-consuming litigation and full and complete expert discovery. Further, with what the district court did in this case, even after there would be expert discovery, the district court postulated as to additional possibilities. There was no need for that, and, in fact, it was improper. The parties set forth an unopposed common issue. There was no overreaching. There was specifically a finding of adequacy of the class representative. The only concern is, are the absent class members' rights protected? That's what this court has noted in Sullivan-DeBeers, in Inouye Pet Foods. The case law is clear. Inouye Pet Foods said, again, district court may take the proposed settlement into consideration when examining the question of certification. Settlement is a crucial factor in this case, and it's a significant distinction from Walmart or any other class case where it's disputed, contested, class certification at issue. I have my colleagues allow me two other questions. Sure. I'd like you to respond, if you would, to the comment by Mr. Patinsky that Dukes was not a change in the law. In fact, if you read it, the Supreme Court was going out of its way in Dukes v. Walmart to indicate it wasn't changing the law. It was applying its law to Falcon, and so we're just not in the Earhart territory. No change in the law. What's your response to that? Your Honor, this court can find that the district court believed it was a change in the law and that it was solely because of Walmart, where after preliminarily approving the settlement, the sole basis is Walmart and the commonality analysis from Walmart that was applied where the court found that there was a need for a different application or an analysis of the commonality, and again erred by applying a case that is being litigated, being contested, addressing employment issues as opposed to the narrow issues of focus in our case. As defense has conceded in their own words, there was a single decision for the borrowers at issue here, and again, it was a single decision from the corporation to allow that subjective criteria to be at issue. Second question. The reference to Gates and the assertion that discussion of averages means you really can't have confidence because it's just not susceptible to confidence when you have individual decisions affecting individuals across the country in radically different ways. You get averages perhaps and a regression analysis, but it does not tell you something common to the class. What's your response to that? Your Honor, in fact, it's probably even a stronger case for the commonality because all the data has been aggregated, and we show, it's the nature of this case, we'll show that it was the minorities, we'll show what they paid, and it was the testimony here, on average about $350 to $1,100 more over the average life of a loan. Well, the response, and I'm trying to get you to respond specifically to what Mr. Patinsky said. If I understood him correctly, he said that knowing that there was an average of $350 tells you nothing about what happened to Joe Smith in the Minneapolis office and whether he actually got a better deal or not. To know that, you'd have to sit down with the loan officer, you'd have to sit down with Joe Smith, and you'd have to bring in a white person similarly situated to Joe Smith and then make a comparison. So it's impossible to know, the way the Supreme Court has described commonality in Walmart, anything from that kind of averaging. Is that an accurate reading of Walmart? Is it a false reading of it? What's your response? First, Your Honor, it would be possible to determine in individual what they paid as opposed to the average. Here on a class-wide basis, we would show the class members that they paid X percentage more and X dollars more than Caucasians did in this instance. Maybe I'm not getting myself clear. Maybe there's just not a good answer to that. But I understood the argument from the defense committee, sort of a Walmart-based argument, that averages do not tell you anything meaningful about individual interactions with loan officers. And in the same way as in Gates where you don't know anything about exposure, it could be greater, it could be lesser, it could be irrelevant for an individual person, here the harm that anybody might have suffered, if they suffered it at all, is going to vary all over the place. And saying, on average, in a circumstance like that, is a little like saying if I've got my foot in a fire and one in a bucket of ice water, on average I'm comfortable. It doesn't really tell you the state of the person. So it's not helpful. It's just not relevant in deciding whether there's something common going on here that's subject to common proof. That's how I understand them to be arguing to us. I'm trying to get you to tell us why that analogy to Gates is wrong, or if you think it's not wrong. Your Honor, first, it's addressing issues for the merits of trial. And that involves individual issues, whether a defendant would argue at trial. That may be an issue to present at trial and to defend, where a defendant would say you can't show the damages or you can't show an individual effect. That would be an individual issue concerning proofs, evidence, and the manageability of trial. Again, by negotiating the resolution here, those issues are off of the table. Because the defendants have agreed this is what, in resolving this litigation, should be paid to the class members. So there's no need to even consider whether at trial, if it could be proven, when we've got the common issue that's agreed to, the issue of the discretion, the effect upon the minorities, the amount of money or the damages suffered, again, where it's negotiated in a settlement, there's no need for the court to even venture into how would it be determined at trial. Because as the courts have said, starting with AMCM, when there isn't a trial, the court need not focus on those issues. Anything else? Thank you very much. The case was extremely well argued. The briefs were very helpful. The fascinating and difficult issues, we will take the matter under advisement.